

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50455 | **DATE** | 11/13/2002 |
| **CASE TITLE** | | Pena vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum and opinion order, the Plaintiff's Motion for Summary Judgment is granted and the case is remanded for determination of Plaintiff's ADHD under Listing 112.11. Defendant's Motion for Summary Judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | NOV 14 2002 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 11/13/2002 | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| sp | courtroom deputy's initials | | Date/time received in central Clerk's Office | sp / mailing deputy initials | |

U. S. DISTRICT COURT

2002 NOV 13 PM 3: 41

# United States District Court
## Northern District of Illinois
### Western Division

SCARLETT PENA FOR REBECCA
PENA

v.

JO ANNE B. BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 01 C 50455

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been
      tried and the jury rendered its verdict.

■     Decision by Court. This action came to hearing before the Court. The issues have
      been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiffs' motion for summary judgment
is granted and defendant's motion is denied. This case is remanded for determination of
plaintiff's ADHD under Listing 112.11. Judgment is entered in favor of the plaintiff and
against the defendant.

Michael W. Dobbins, Clerk of Court

Date: 11/13/2002

Gale L. Graeff, Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

SCARLETT PENA for　　　　　　　　　)
REBECCA PENA,　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　Plaintiff,　　　　　　　　　　 )　　Case No. 01 C 50455
　　　　　　　　　　　　　　　　　　 )
　　　　　v.　　　　　　　　　　　　 )　　Magistrate Judge
　　　　　　　　　　　　　　　　　　 )　　P. Michael Mahoney
JO ANNE B. BARNHART,　　　　　　　 )
COMMISSIONER OF SOCIAL　　　　　　 )
SECURITY,　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　Defendant.　　　　　　　　　　 )

## MEMORANDUM OPINION AND ORDER

Scarlett Pena, for her daughter Rebecca Pena, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income ("SSI") pursuant to Section 223 of the Social Security Act (the "Act"). This matter is before the Magistrate Judge pursuant to consents filed by both parties on February 15, 2002. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.　　BACKGROUND

The Plaintiff filed an application for SSI benefits on March 8, 2002, alleging disability since October 7, 1997. (Tr. 53-54 ). Plaintiff's claim of disability was based on, among other things, severe attention deficit hyperactivity disorder ("ADHD"), with global development delays in expressive and receptive language skills. (Pl.'s Mem. at 1). Plaintiff's application for SSI was

1

denied on July 11, 2002. (Tr. 54). Plaintiff then filed a request for reconsideration on July 27, 2000, (Tr. 57), which request for reconsideration was denied on August 15, 2000. (Tr. 58-61). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on August 29, 2000. (Tr. 62). Plaintiff appeared, with counsel, before ALJ Cynthia M. Bretthauer on March 16, 2001. (Tr. 69-71). The ALJ determined that Plaintiff was not disabled under the Act in a decision issued on May 22, 2001. (Tr. 13-19). Plaintiff appealed this decision to the Appeals Council on May 25, 2001 (Tr. 5-6). The ALJ's decision became the final decision of the agency when the Appeals Council denied review on November 14, 2001. (*Id.*).

## II.  FACTS

Plaintiff was born on September 10, 1992 and is a nine year old girl who resides with her mother, older sister, younger sister, and her mother's significant other. (Pl.'s Mem. at 2). At the time of the hearing, Plaintiff was eight years old. (Tr. 24-25). Scarlett Pena, Plaintiff's mother, testified that, at the time of the hearing, Plaintiff was in second grade at Meehan Elementary School in Belvidere, Illinois. (Tr. 25). Plaintiff's mother further testified that Plaintiff is enrolled in regular courses at the elementary school but that Plaintiff attends two forty-five minute special classes during the day on Tuesday and Thursday for speech and language. (Tr. 25-26). Plaintiff's mother also stated that, in her opinion, Plaintiff is an average student in reading but a below average student in math and social studies. (Tr. 26-27).

At the time of the hearing, Plaintiff was taking Adderall twice a day. (Tr. 27). Plaintiff's mother testified that she administers the Adderall both in the morning before school and then after school when Plaintiff comes home. (*Id.*). In regards to the after school dose, Plaintiff's mother testified that if Plaintiff does not receive medication in the afternoon, Plaintiff becomes angry and

2

aggressive. (*Id.*). However, if medicated, Plaintiff's mother testified Plaintiff is much better behaviorally. (Tr. 28).

Plaintiff does not appear to have many friends. Plaintiff's mother stated Plaintiff says she has friends but also tells her mother that when Plaintiff approaches kids in school they try to get away from her. (Tr. 30). Plaintiff's mother attributed this to the fact that Plaintiff is rude and aggressive. (*Id.*). Plaintiff's mother testified that Plaintiff has no friends come over to the house and no friends in the neighborhood. (*Id.*). Seemingly, Plaintiff's only interaction with children around her age is with her sisters. Plaintiff's activities usually include playing video games, reading, watching tv, or riding her bike if it is nice outside. (*Id.*).

In terms of self-care skills, Plaintiff's mother testified Plaintiff cannot brush her own hair. (Tr. 34). However, Plaintiff can take a bath on her own. (*Id.*). Plaintiff's mother further testified that Plaintiff can brush her teeth but must be reminded constantly to do so. (Tr. 35). Additionally, Plaintiff's mother must constantly remind and monitor Plaintiff to put her stuff away, clean her room, and put on her socks correctly. (Tr. 37). Plaintiff's mother testified that she filed Plaintiff's disability claim because she is different from other people and Plaintiff is very hard to control and it is difficult for her to learn. (Tr. 39).

## III. **MEDICAL HISTORY**

Plaintiff was born on September 10, 1992. (Tr. 130). On December 14, 1998, at the age of six, Plaintiff was evaluated by teacher Christal Tompkins at Meehan Elementary School. (Tr. 136). Ms. Tompkins administered the Slosson Intelligence Test, which Plaintiff scored in the below average range. (Tr. 138). The Plaintiff scored below average in the General Intelligence Quotient

with a score of 66. (*Id.*). Ms. Tompkins also tested Plaintiff's achievement and also Plaintiff's auditory and visual processing. Ms. Tompkins noted that Plaintiff's kindergarten readiness skills were weak because Plaintiff had difficulties with her letter identification, number concepts, colors, and fine motor skills. (*Id.*). Additionally, Plaintiff had difficulty repeating back words and numbers. (*Id.*). Ms. Tompkins also noted that Plaintiff had much difficulty sitting still and was constantly moving in and out of her chair. (*Id.*). Overall, Ms. Tompkins found Plaintiff's ability scores below average, achievement scores below average, poor auditory and visual memory, visual spatial defects, and poor attention span. (*Id.*).

Plaintiff began seeing Dr. Angela Rodriquez, a physician at the Rockford Clinic, on January 26, 1999. (Tr. 149). Dr. Rodriquez thought Plaintiff to be "an alert, active, cooperative young girl who was quite busy about the room before I started to examine her, but was quite cooperative during the examination." (*Id.*). On March 16, 1999, Plaintiff again saw Dr. Rodriquez. (Tr. 152). Dr. Rodriquez opined that Plaintiff had Attention Deficit Disorder ("ADD") with questionable learning disability and prescribed 10mg of Adderall a day, a medication often prescribed to treat ADHD.[1] (*Id.*). On May 21, 1999, Plaintiff saw Dr. Rodriquez for follow-up of the March 16, 1999 exam. On this date, Dr. Rodriquez reported that Plaintiff's mother stated that Plaintiff's teachers have noticed a positive impact in Plaintiff's school performance since she began taking the Adderall. (Tr. 154).

---

[1]Adderall (mixed salts of a single-entity amphetamine product) typically improves attention span, increases the ability to follow directions, and decreases distractibility among children ages three and older. Adderall may also decrease impulsivity, stubbornness and aggression. Adderall is convenient for patients, parents, and care givers, because it is effective for most patients when taken once or twice a day. Since it is a different mixture of amphetamine isomers, Adderall may help some individuals when other medications (such as Ritalin) have not proven effective. *See* http://www1.adhdguide.net/pharmacy/adhd/adderall.htm (last visited November 5, 2002).

4

In April of 2000, Plaintiff was referred by Dr. Rodriquez to Dr. Philip Miner for a neurological consultation. (Tr. 158). On April 14, 2000, Plaintiff saw Dr. Miner who confirmed a finding of ADHD and also noted that Plaintiff had a probable learning disorder and poor gross and fine motor coordination. (*Id.*). Dr. Miner also noted in his report that Plaintiff's maternal uncle also had a learning disability. (*Id.*). Dr. Miner then referred Plaintiff to an ADD clinic. (Tr. 159).

On April 3, 2000, Kevin Johnson, a school psychologist, performed a psychological evaluation for academic, language development, and socialization problems. (Tr. 161). Mr. Johnson administered the Wachsler Intelligence Scale for Children-Third Edition ("WISC-III") to Plaintiff. Mr. Johnson stated that averaged scores were between 85 and 115 for the WISC-III. (Tr. 162). Plaintiff's overall cognitive ability, Mr. Johnson reported, was within the average to low average range. (Tr.163). Plaintiff's broken down scores were reported as follows: Verbal IQ (81)--slightly below average, and Nonverbal Reasoning Skills (99)--solid average range. Mr. Johnson also reported Plaintiff demonstrated a significant strength on the Picture Arrangement in a sequential order to tell a story that makes sense. (*Id.*). Plaintiff's weaknesses appear to fall within her ability to tell how two things are alike; retain auditory information in her head as well as identify meanings of words. (*Id.*).

To access her overall academic skill development, Mr. Johnson administered Plaintiff the Woodcock Johnson Revise Tests of Achievement ("WJ-R"). The WJ-R evaluates skills in reading, math and written language. (Tr. 163). The Plaintiff scored an 88 on the Broad Reading Cluster, falling in the low average range for her age. (*Id.*). The test measures skills in terms of identifying familiar and/or unfamiliar words and the comprehension fo brief passages. Plaintiff scored a 70 on

5

the Math Cluster, which evaluates skills in terms of performing mathematical computations and analyzing practical math problems, well below the average range for her age. (*Id.*). Lastly, Plaintiff scored a 82 on the Broad Written Language Cluster, which assesses skill development in terms of single-word responses and sentences, which is low average to slightly below average for Plaintiff's age. However, Plaintiff scored very poorly on the Dictation sub test which assesses her skills in spelling, punctuation, capitalization and word usage. (*Id.*). Overall, Mr. Johnson thought that Plaintiff has a primary handicapping condition of a specific learning disability and that Plaintiff should consult with speech and language therapists. (Tr. 164).

On June 17, 2002, Dr. Rodriquez, in response to a request by the Bureau of Disability Determination Service ("BDDS"), filled out a report concerning the Plaintiff. In response to the direction asking Dr. Rodriquez to circle symptoms if present in the patient, Dr. Rodriquez circled 14 out of 17. Those include: seems restless, has difficulty remaining seated when required, easily distracted by extraneous stimuli, difficulty waiting turn/ low tolerance to frustration, difficulty listening to and following through on instructions, difficulty sustaining attention in tasks or play, shifts often from one uncompleted task to another, interrupts and intrudes, often looses items necessary for task completion, lack of consideration of consequences of dangerous activities, inappropriate attention seeking behavior, and insensitivity to self and others. (Tr. 188). In evaluating Plaintiff's behavior, Dr. Rodriquez noted Plaintiff is argumentative, non-compliant, uncooperative, and irritable. (Tr. 189).

On July 5, 2000, Plaintiff saw Angela Miller, LCSW, of the Attention Deficit Hyperactivity Disorder Clinic. (Tr. 192). Ms. Miller noted Plaintiff "showed difficulties with attention and concentration but still showed problems after medication." (Tr. 126). Ms. Miller also reported

Plaintiff "was very distractable, was impulsive and overly active during the screening. She was very symptomatic and her attention problems affected her ability to perform." (*Id.*). Ms. Miller recommended Plaintiff start taking 5mg of Adderall in the morning and 2.5 mg in the afternoon. (*Id.*). Also, Ms. Miller recommended Plaintiff's mother should follow through with taking the patient to see a geneticist to assess the possibility of hereditary issues affecting the patient's developmental delays. (Tr. 193).

On July 5, 2000, Dr. Carl Hermsmeyer, a psychologist for the state agency, reviewed Plaintiff's medical evidence and concluded Plaintiff did not have an impairment that met, medically equated or functionally equaled a listed impairment. (Tr. 195). Dr. Hermsmeyer reported that Plaintiff's cognitive/ communicative functioning was less than marked (one step better than marked), her social functioning was less than marked, her personal functioning was less than marked, and her concentration, persistence, and pace were marked. (Tr. 197). Dr. Hermsmeyer stated his reasons for such a finding were that "[t]he school states she is well behaved when medicated. With proper adjustment of treatment this child has the ability to function in an age appropriate manner." (Tr. 198).

On July 7, 2000, Plaintiff and her mother saw Dr. Miner to discuss the ADD clinic evaluation. (Tr. 194). Dr. Miner reported that, based on the clinic's evaluation, Plaintiff suffers from ADHD, global development delay in the area of speech and language processing and possible genetic syndrome. (*Id.*).

In addition to Dr. Hermsmeyer, Dr. Donald MacLean, also a psychologist for the state agency, reviewed Plaintiff's medical records and concluded Plaintiff did not have an impairment that met, medically equaled, or functionally equaled a listed impairment. (Tr. 199). Dr. MacLean did

note however that Plaintiff "does have some difficulties concentrating and staying on task at times and becomes aggressive if she doesn't get her own way." (Tr. 202). Dr. MacLean also reported that Plaintiff "is able to do what is required of her when she chooses to do so." (Id.). Lastly, Dr. MacLean reported that Plaintiff has "some delayed math skills plus paper/pencil skills but she does receive some LD services to assist her LD problems." (Id.).

On August 31, 2000, Plaintiff did a follow-up with Ms. Miller of the Attention Deficit Hyperactivity Disorder Clinic. (Tr. 204). Ms. Miller reported that Plaintiff's mother had decreased the amount of Adderall administered to her daughter because Plaintiff began experiencing headaches and dizziness when receiving both doses during the daytime. (Id.). Ms. Miller also reported that Plaintiff's mother noted that Plaintiff "seems to benefit from the medicine" because Plaintiff has much more difficulty paying attention when she has not had her medicine. (Id.). Plaintiff's mother also informed Ms. Miller that she too can notice a difference in her daughter when she is medicated because she seems more attentive. (Id.). Ms. Miller also noted in her report that Plaintiff's mother did go to a geneticist but Plaintiff's mother opted not to follow through with the genetic testing as she did not feel it was necessary. (Id.).

On January 15, 2001, Plaintiff and her mother saw Dr. Miner concerning Plaintiff's weight loss. (Tr. 206). Plaintiff's mother reported to Dr. Miner that Plaintiff does not eat anything and appears to be losing weight seemingly because of the Adderall. (Id.). Also, Plaintiff's mother reported Plaintiff has increased oppositional and defiant behavior in that she refuses to do anything including her homework. (Id.). Dr. Miner recommended Plaintiff switch from Adderal to taking

18 mg of Concerta,[2] a new medication prescribed for ADHD, in the morning along with 4 mg of Periactin to stimulate Plaintiff's appetite. (*Id.*).

## IV.   STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence"

---

[2] Apparently, Concerta is a relatively new form of medication used to treat ADHD which was approved by the Food and Drug Administration in August 2000. It contains methylphenidate, the same medication found in the the brand-name drug known as Ritalin. The difference is that the Concerta tablet has been formulated with a special drug-release system that allows the medication to be released slowly over time. The tablet has an outer coat of the medication, and then two small compartments of medication inside. When swallowed, the outer coat of medication dissolves quickly. Over the next several hours, the inner two compartments are gradually released as well. The result is that the methylphenidate medication is released *gradually* into the body, reaching its peak level in the bloodstream at about 6 to 8 hours after ingestion. One dose will supply enough of the medication for a full 12 hours. *See* Dr. Shari Nethersole, *Pediatrics, at* http://www. familyeducation.com (last visited November 5, 2002).

is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or

mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through three steps in determining whether a child claimant is disabled. 20 C.F.R. §416.924(a). The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; and (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment for a child is one which as an impairment or combination of impairments, causes more that a minimal functional limitation. 20 C.F.R. § 416.924(b). In making the determination as to whether a child's impairment is severe the Commissioner considers the claimants impairment(s) in relation to his or her age. 20 C.F.R. § 416.924b(a)(1). If the claimant

---

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

11

suffers from a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). If the child claimant does not have an impairment(s) that meets the requirements of the listing, the Commissioner must determine whether the impairment(s) are medically equivalent in severity to an impairment(s) in the listing. 20 C.F.R. § 416.926a(a). In determining whether the claimant meets the listing or is medically equivalent to the listing the Commissioner considers whether the impairment(s) prevents the claimant from functioning independently, appropriately and effectively in an age appropriate manner. 20 C.F.R. § 416.926a(a). If the claimant is found to suffer severe impairment(s) that meet or are medically equivalent to the listings, disability must be found and the inquiry is ended. 20 C.F.R. § 404.1520(d).

If the claimant's impairment(s) is found not to meet or be medically equivalent to the listing, then the Commissioner must do an individualized functional assessment to determine whether the claimant has an impairment or combination of impairments that would be of comparable severity to an impairment that would disable an adult. 20 C.F.R. § 416.924d(a). The Commissioner must consider the nature of the impairment(s), the claimant's age and ability to be tested at that age, the ability to perform age appropriate daily activities and other relevant factors. 20 C.F.R. §416.924d(a). The functional areas used to measure the severity of a child's impairment (age 6-12) are

12

cognitive/communicative function, social function and personal/behavioral function. 20 C.F.R. Part 404, Subpart P, Appx 1 (Listings) § 112.00(C)(3).

## VI.    ANALYSIS

The court will proceed through the three step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on July 30, 1999. (Tr. 12).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and forty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding.  The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments.  Specifically, the ALJ found that Plaintiff suffered from a learning disorder, ADHD, and speech-language delays.. (Tr. 14).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it.  The ALJ's finding as to Step Two of the Analysis is affirmed.

C.       Step Three:  Does claimant's impairment meet or medically equivalent to an impairment

13

in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 15) The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals in severity the criteria of any of the listed impairments of Appendix 1. (Tr. 15). The ALJ then went on to state, in one sentence, "[i]n particular, the severity of [Plaintiff's] ADHD does not satisfy the requirements described in Listing 112.11." (Tr. 15). The Magistrate Judge has some deep concerns about the ALJ's evaluation (or lack thereof) and determination of Plaintiff's ADHD. The Magistrate Judge believes the severity of Plaintiff's ADHD deserves more than a mere conclusory sentence, especially because, when fully evaluated, the Plaintiff's ADHD may meet or medically equal in severity the criteria of a listed impairment in Appendix 1. In order to properly determine that Plaintiff does not satisfy the requirements of Listing 112.11, the ALJ must proceed through the listing and the cross references to other listings.

Section 112.11 provides:

> *Attention Deficit Hyperactivity Disorder*: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented findings of all three of the following:
>
> 1. Marked inattention, and
> 2. Marked impulsiveness, and
> 3. Marked hyperactivity.
>
> AND
>
> B. For ... children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02

14

Paragraph B2 of 112.02 provides:

> 2. For children (age 3 to attainment of age 18), resulting in at least two of the following:
>
>> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests or language and communication; or
>>
>> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available; and including, if necessary, the results of appropriate standardized tests; or
>>
>> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>>
>> d. Marked difficulties in maintaining concentration, persistence, or pace.

In order to properly analyze Plaintiff's ADHD impairment, 112.00C must be analyzed.

112.00 (Mental Disorders), provides, in subsection C:

> *Assessment of Severity*: In childhood cases, as with adults, severity is measured according to the functional limitations imposed by the medically determinable mental impairment.

However, the range of functions used to assess impairment severity for children varies at different stages of maturation. The functional areas that we consider are: Motor function; cognitive/communicative function; social function; personal function; and concentration, persistence, or pace. In most functional areas, there are two alternative methods of documenting the required level of severity:(1) Use of standardized tests ... and (2) use of other medical findings. The use of standardized tests is the preferred method of documentation if such tests are available.

...

Where "marked" is used as a standard for measuring the degree of limitations it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function ... independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction.

Any analysis should begin with Listing 112.11 which requires medically documented findings indicating marked inattention, marked impulsiveness, and marked hyperactivity. Proceeding through each of the three, the Magistrate Judge first addresses marked inattention.

Plaintiff's medical record appears to be filled with evidence of marked inattention. On numerous occasions doctors, psychologists, teachers and Plaintiff's mother have noted Plaintiff's inattentiveness. For example, Plaintiff's mother filed out a function report on the Plaintiff, and in response to the question: Is the child's ability to pay attention and stick with a task limited?, Plaintiff's mother responded "Yes." (Tr. 90). Additionally, in the same report, Plaintiff's mother reported that Plaintiff is unable to: keep busy on her own, finish things she starts, work on arts and crafts projects, complete homework, or complete chores most of the time. (*Id.*). Additionally,

16

Plaintiff's first grade teacher, Ms. Diane M. Byers, reported Plaintiff is "easily distracted" and "on a continual basis student is reminded to stay on task and use her best effort. Work often gets done quickly but is completely incorrect." (Tr. 107). Dr. Rodriquez started Plaintiff on Adderall because, as Dr. Rodriquez wrote, "[i]n view of the findings and her (Plaintiff's) history of inattention, I have recommended that we start Adderall." (Tr. 153). Also, in addition to Dr. Rodriquez, Dr. Miner reported that Plaintiff "is having problems paying attention and staying on task." (Tr. 158). Lastly, Ms. Miller, of the ADHD clinic, noted in her report that Plaintiff's "attention problems affect her ability to perform." (Tr. 126). Thus, there appears to be some evidence to support an argument that Plaintiff suffers from marked inattentiveness.

Next, is marked impulsiveness. Much of the same evidence discussed above may also provide medically documented findings as to Plaintiff's impulsiveness. However, in addition to the above findings, there may also be additional evidence. For example, in Ms. Byers report (Plaintiff's first grade teacher), she reported that Plaintiff displays inappropriate talking and laughing without control. (Tr. 109). Additionally, Ms. Byers noted that Plaintiff has a problem controlling her behavior and often runs, pinches, talks, or calls out teachers name at inappropriate times. (Tr. 110). Therefore, as with marked inattentiveness, there appears to be some evidence to support an argument that Plaintiff suffers from marked impulsiveness. .

Lastly, before looking to paragraph B, the Magistrate Judge turns to Plaintiff's marked hyperactivity. Without having to actually cite the whole administrative record, there appears to be some, if not plenty, of evidence to support an argument that Plaintiff suffers from marked hyperactivity. Whether from her teacher who describes Plaintiff as "easily distracted, unorganized" who must be reminded to stay on task, (Tr. 107), or the Rockford ADHD clinic which diagnosed

Plaintiff with ADHD, noting Plaintiff was "very distractable, was impulsive and overly active" causing problems with her ability to perform normally, (Tr. 126), there appears to be ample evidence. If Plaintiff suffers from marked inattentiveness, impulsiveness, and hyperactivity, Plaintiff must then be able fulfill two of the appropriate age-group criteria in paragraph B2 of 112.02 to be found disabled.

The Magistrate Judge will address all four of the listed impairments under B2, keeping in mind that Plaintiff need fulfill only two, as required under the statute. Section 112.00 (C)(3) (*Assessment of Severity--Primary School Children Age 6 to Attainment of Age 12*) states "[t]he measures of function here are similar to those for preschool-age children except that the test instruments may change and the capacity to function in the school setting is supplemental information." *Id.* Additionally, "school records are an excellent source of information concerning function and standardized testing should always be sought for school-age children." *Id.* Further, §112.00 (C)(2)(a)(*Assessment fo Severity--Preschool Children Age 3 to Attainment of 6*) states:

> In the preschool years and beyond, cognitive function can be measured by standardized tests of intelligence, although the appropriate instrument may vary with age. A primary criterion for limited cognitive function is a valid verbal, performance, or full scale IQ of 70 or less. The listings also provide alternative criteria, consisting of tests of language development or bizarre speech patterns.

On April 3, 2000, Plaintiff was administered numerous tests by Kevin Johnson, a social psychologist. (Tr. 161). Mr. Johnson reported, that based on these tests, Plaintiff's full scale IQ is 88. (Tr. 162). Plaintiff's score is above the primary criterion for limited cognitive function listed in 112.00(C)(2)(a). but the Magistrate Judge notes the listings also provide for alternative criteria,

consisting of test of language development or bizarre speech patterns, which may or may not be found in Plaintiff's medical record. The Magistrate Judge has already in this opinion pointed to evidence which would indicate an impairment.

Listing 112.00(C)(2)(b) provides:

> Social functioning refers to a child's capacity to form and maintain relationships with parents, other adults, and peers. Social functioning includes the ability to get along with others (e.g. family members, neighborhood friends, classmates, teachers). Impaired social functioning may be caused by inappropriate externalized actions (e.g. running away, physical aggression--but not self-injurious actions, which are evaluated in the personal area of functioning), or inappropriate internalized actions (e.g. social isolation, avoidance of interpersonal activities). Its severity must be documented in terms of intensity, frequency, and duration, and shown to be beyond what might be reasonably expected for age. Strength in social functioning may be documented by such things as the child's ability to respond to and initiate social interaction with others, to sustain relationships, and to participate in group activities. Cooperative behaviors, consideration for others, awareness of others feelings, and social maturity, appropriate to child's age, also need to be considered. Social functioning in play and school may involve interaction with adults, including responding appropriately to person in authority (e.g., teachers, coaches) or cooperative behaviors involving other children. Social functioning is observed not only at home but also in preschool programs.

During the hearing before the ALJ, both Plaintiff's mother and Plaintiff testified as to Plaintiff's social interaction with others. Much can be gained from Plaintiff's mothers testimony regarding her daughters social interaction with others:

Q. Okay. Does she have any friends at school?

A. She says she does. But my, my daughter tells me that when she goes ands says

hi to them and stuff they get away from her.

Q. Okay.

A. Because she's rude, she's rude, she rude, you know. She'll come up to them and she wants them to be her friend so bad that they get afraid of her.

Q. Well that's too bad. Does she have any friends that come over to the house?

A. No.

Q. Does she have any friends in the neighborhood where you live?

A. No.

...

Q. What does she do during the summer, does she participate in any organized activities?

A. I put her, yeah, I put her into YMCA.

Q. Um-hum. For day camp type things?

A. Yes.

Q. Okay. How did she do with that?

A. But I didn't put her last year because it was bad. She wouldn't associate with kids, the teacher told me she would pinch them, she would, you know, it was hard for them to control her.          (Tr. 30-31).

In addition to the Plaintiff's mother's testimony, the Plaintiff herself testified that she did not have any friends at school. (Tr. 44). Additionally, Plaintiff testified that she resorts to hitting her sisters when they anger her and when asked why she hits her sisters Plaintiff responded "I forgot." (Tr. 48). Plaintiff's teacher, Ms. Byers, noted in her report to the Bureau of Disability

Determination Services, that "[s]ocially, Rebecca is having a difficult time with appropriate behavior: hitting, tattling, touching." (Tr. 108). Overall, the medical records display a child who has no friends her own age, who does not make friends easily, (Tr. 111), who tends to bully other children, (*id.*), who is excluded from activities by other children, (*id.*), who does not cooperate well with her mother, (*id.*), and who cannot work independently. (Tr. 145). Thus, there appears to be evidence to support a finding of impairment.

Next, is personal function. Listing 112.00(C)(2)(c)(Personal function) provides:

> Personal functioning in preschool children pertains to self-care; i.e. personal needs, health, and safety (feeding, dressing, toileting, bathing; maintaining personal hygiene, proper nutrition, sleep, health habits; adhering to medication or therapy regimens; following safety precautions). Development of self-care skills is measured in terms of the child's increasing ability to help himself/herself and to cooperate with others in taking care of these needs. Impaired ability in this area is manifested by failure to develop such skills, failure to use them, or self-injurious actions. This function may be documented by a standardized test of adaptive behavior or by a careful description of the full range of self-care activities. These activities are often observed only at home but also in preschool programs.

The majority of evidence regarding Plaintiff's personal functioning appears to come from activities witnessed at home by Plaintiff's mother. First, Plaintiff's mother, when asked about Plaintiff's self-care skills, testified that Plaintiff cannot brush her hair and just recently learned how to take a bath and brush her teeth but must be closely monitored. (Tr. 34-35). When asked to further explain why Plaintiff's mother must closely monitor Plaintiff's teeth brushing, Plaintiff's mother stated "I have to stand there to make sure she brushes her teeth. Because if not she'll run the water and just put toothpaste all the way around the sink and turn it off and say she brushed her teeth." (Tr.

37).  When asked about other activities Plaintiff's mother must monitor, she testified: "[t]he brushing teeth, the putting away stuff, cleaning her room, putting on her socks, because she puts them on backwards.  She puts her clothes on backwards.  So I have to make sure she puts them on the right way.  I comb her hair every day because she can't comb her hair, she doesn't know how."  (*Id.*).  With regards to trying to get Plaintiff to go to bed, Plaintiff's mother stated that Plaintiff does not fall asleep easily and most of the time "[s]he'll get up, go drink water, will use the bathroom, get up, run-around, hide behind a chair, got to go get her, get back in your room, you need to go to bed." (Tr. 38).  When Plaintiff's mother tells Plaintiff she must go to bed, Plaintiff gets angry and tells her mother "you don't tell me what to do" and she will stand by the door and put her foot there so Plaintiff's mother cannot close the door.  (Tr. 39).

   Plaintiff's mother, in filling out her daughter's functioning report, (Tr. 82), answered "No," when asked about her daughter's self-care, to the following: uses zipper by self, buttons clothes by self, takes a bath or shower without help, brushes teeth, combs or brushes hair, washes hair by self, chooses clothes by self, picks up and puts away toys, hangs up clothes, does what he or she is told most of the time, obeys safety rules, for instance, looks for cars before crossing street, and accepts criticism or correction.  (Tr. 89).  Plaintiff's mother did answer "Yes" to the following: ties shoelaces, eats by self using knife, fork and spoon, helps around the house, and gets to school on time.  (*Id.*).  However, with regards to helping around the house, Plaintiff's mother reported, although Plaintiff helps, she does a poor job and often needs to be reminded what to do.  (Tr. 112).  Lastly, on January 22, 1999, Plaintiff's mother reported to a social worker at the Boone County Special Education Cooperative that Plaintiff "insists on drinking from a baby bottle at home."  (Tr. 148).

22

The only outside the home observation reported by anyone other than Plaintiff's mother appears to be from Plaintiff's first grade teacher Ms. Byers who checked "No" when asked on a school activities questionnaire: Is there a problem with age-appropriate hygiene and self-care? (Tr.108). However, Plaintiff's mother reported she must dress Plaintiff because she puts clothes on backwards, she must wash Plaintiff's hair, help with shoelaces, make sure Plaintiff brushes her teeth and other daily hygiene activities. Additionally, Plaintiff does not take mediation at school, rather she takes medication before and after school, so Plaintiff does not have the responsibility of having to adhere to a medicine regime. Thus, there appears to be some evidence that may support a finding of marked impairment of personal function. Next, the Magistrate Judge addresses the fourth marked impairment, maintaining concentration, persistence or pace.

Listing 112.00(C)(2)(d) provides:

> This function may be measured through observations of the
> child in the course of standardized testing and in the course of
> play.

Two doctors, Dr. Hermsmeyer and Dr. MacLean, both of whom opined Plaintiff is not disabled, both reported, in their Childhood Disability Evaluation Form, that Plaintiff suffers from marked impairment of concentration, persistence, or pace. (Tr. 197, 201 respectively). Dr. MacLean reported Plaintiff "does have some difficulties concentrating and staying on task at times and will become aggressive if she doesn't get her own way." (Tr. 202). Plaintiff's mother answered, in Plaintiff's function report, "Yes" when the question asked is the child's ability to pay attention and stick with a task limited. (Tr. 90). The question further listed specifics as to what the child can and cannot do with regards to the child's ability to pay attention and stick with a limited task to which

23

Plaintiff's mother answered "No" to the following: keeps busy on his/her own, finishes things he or she starts, works on arts and crafts projects (draw, paints, knits, does woodwork), completes homework, and completes chores most of the time. (*Id.*). Therefore, with the findings of Dr. Hermsmeyer and Dr. MacLean and on Plaintiff's function report as filled out by Plaintiff's mother, there appears to be medical evidence to possibly support a finding of marked impairment of maintaining concentration, persistence or pace.

Before the ALJ can move onto the six domains of functioning, as he did in his opinion, the ALJ must go through the process to determine whether Plaintiff can or cannot satisfy the listing for ADHD. The Magistrate Judge is not suggesting the ALJ's determination, that the severity of Plaintiff's ADHD does not satisfy the requirements in Listing 112.11, is incorrect, but only that greater elaboration is necessary. The ALJ should discuss the evidence at least to the extent to show the court the path used by the ALJ and the evidence accepted and the evidence rejected. Additionally, the ALJ should reevaluate Plaintiff, who is now a bit older, to get an up to date determination of her condition.

## VII.   CONCLUSION

For the above stated reasons, the Magistrate Judge orders Plaintiff's Motion for Summary Judgment is granted and the case remanded for determination of Plaintiff's ADHD under Listing 112.11. It is further ordered that Defendant's Motion for Summary Judgment is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

DATE: 11/13/02